We'll now move to the second case of the morning, United States v. Andre Patterson, case number 18-1167. And we'll begin for the appellant, Ms. Varner. Good morning, your honors. May it please the court. My name is Sarah Varner and I represent Andre Patterson. Mr. Patterson was sentenced to 156 months by the district court. Determination of the drug quantity in this case drove the sentence. And this court specifically returned Mr. Patterson's case to the district court for an explicit finding on the drug amount. What was required by the district court was a finding that 20 kilos was within the scope of Mr. Patterson's agreement and was reasonably foreseeable to him in connection with the criminal activity that he agreed to. An individualized inquiry is required by the district court. The district court must state precisely why the drug amount in this case was reasonably foreseeable to him as a co-defendant. And the district court must rely on more than his mere presence at the quality end meeting. This court, when it returned the case to the district court, noted ambiguity. In footnote 4 of this court's September 17, 2017 opinion, this court noted that Mr. Patterson had been held to the highest and most optimistic of the drug quantity stated at the quality end meeting. And mentioned that there was ambiguity present in the drug amount, possibly because of Mr. Patterson's mental health status at the time. On remand, though it was argued to the district court by defense counsel, the district court ignored Mr. Patterson's mental health status when it determined the drug quantity in this case. And Mr. Patterson's mental health status matters in this case. It was relevant to both the scope of his agreement and the reasonable foreseeability of the drugs specifically related to him. Between 2012 and 2015, Mr. Patterson had five assessments of his mental health. Mr. Patterson was, I think everyone here would agree today, a very seriously mentally ill man. And the evidence of his mental illness is apparent in the only meeting that he attended in regards to this conspiracy. And that's relevant to the district court's individualized inquiry necessary for Mr. Patterson. Mr. Patterson had what the experts in this case called a longstanding and severe psychotic disorder. As the meeting at the Quality Inn progresses, it's clear that Mr. Patterson is unwell. Mr. Patterson starts insisting that there's an armed mystery man in the back of the stash house. The stash house that doesn't exist, that he has no knowledge of. But he insists that there's an armed man in the back. He also begins to insist that there is a very large quantity of cash stored at that house. And he fixates on that cash, even though everyone else involved in that meeting tries to convince him otherwise, saying, I think you might be just making that up. Mr. Patterson responds when they say, what are you going to do if there's no cash there? He says, I'm going to put it there with my mind. Can I ask you a question about, when I, what I'm concerned about here is, how should the law deal with uncertainty on drug quantity? Against the backdrop of the transcript you're talking about, the meeting at the Quality Inn. Because if we conclude, if we adopt your position, and we conclude that the record does not support the finding on the 20 kilos, Judge Barker is very clear that, I think as she said, she'd be really hard-pressed to come up with any other quantity. Any other quantity would have to come out of the same facts, and as I understand them, the main evidence, or the really only evidence, addressing quantity is the November 15, 2011 meeting at the Quality Inn. Correct. That transcript shows that there's a reference to 6 kilos on the first buy. The second buy had 10. Okay. But I don't know that one quantity is any more certain than another quantity. So how does the law, how should the law deal with that? Well, I think this Court stated in Taylor that a court must err on the side of caution when confronted with a number of plausible drug quantities, none of which are reported. So what does that mean as a practical matter in your view here? I think in this case it would obviously be a specific case-by-case analysis because it has to be an individualized inquiry, and in this case it has to include mental health. And I think the best the district court can do in this case is Mr. Patterson inquires directly one time, and the answer that he receives to his direct question, how much did you get the last time, was 10 kilos. And I think that is the best quantity and the only quantity that he can be held responsible for. Building on that though, isn't the effect of the sentence that Judge Barker gave him within this 30 guideline range which his counsel is arguing for? It is, Your Honor, but I don't think that that matters. My friend argues that there's no error in this case because he still got a sentence within the same guideline range. But the district court is required to start by calculating the base offense level. And Judge Barker's statement was in response to defense counsel who was continuing to argue, we think the base offense level is wrong here. And she says, well, you still got a sentence in that offense level anyway, but that's not the same thing as saying, I would have imposed the same sentence no matter where we started with the base offense level. She specifically stated in the transcript that she gave him those 12 months off because of his rehabilitation efforts from the time of the first sentencing. So it's very unclear what would have happened if we had started from the base offense level 30 and she'd given him the same 12 months off, he might have gotten a sentence as low as 123 months on this case. It strikes me that that may well be your best position, that if there's an error here, there's no way to call it harmless just based upon the record we're dealing with. Correct, Your Honor. I think Judge Barker was very explicit why she gave that 12 months off his sentence. I read it as not so much a credit for successfully completing the challenge program, but rather a recognition that he was on a positive path in prison and wanted to encourage him to continue on that path. I think that's right, that she saw in him the capacity to be rehabilitated and thought perhaps he didn't need such a long sentence. I think that the mental health can't be ignored in this case. What the judge did rely on was Mr. Patterson's mere presence at the November meeting, and we know from this court that mere presence isn't enough. She says he was present and participating at least by his presence, and that that was enough for her to find him responsible for the 20 kilos. We know that there has to be instead a substantial degree of commitment to the conspiracy's objectives. And as I was stating, as this meeting continues to wear on, we know Mr. Patterson is not right. He's obsessed about the cash in the house. He says when the 20 kilo figure is finally mentioned, he says, I want that cash. His next comment is, I want that cash. I don't even want the dope. So he's fixated on something that everyone in the room is trying to convince him doesn't exist. He makes many, I tried to sit down and just count last night, and I lost count, many, many statements about how the Lord brought him to this conspiracy. And what's particularly important about this is that these odd statements that he made at the meeting are entirely consistent with the reports by the mental health experts in this case. What Dr. Calloway would call a complex delusional system, what Dr. Sajowski called paranoid schizophrenia, what Drs. Stripling, Riley, and Newman called a delusional disorder with bizarre content. The statements that he made at the meeting about God bringing him there, his fixation with numbers, with his belief that he was there on a mission to save Agent God Save's life, those statements are all consistent with his delusional disorder. Should he be guilty of anything? I think that's, unfortunately in this case, the mental health competency was dropped at one point. And I think that may be the case of later litigation for Mr. Patterson, but he is, at this point, convicted. And it's the only statement that Judge Barker made regarding his mental health when defense counsel tried to argue, look, it's clear from the transcript. The Seventh Circuit said when they sent the case back to us that we're concerned with this transcript. The district court said, you're stuck with the conviction on the drug count. That was her statement regarding his mental health and her assessment of it. There is a lot, though, in the transcript, is there not, that he pretty clearly seems to be contemplating doing a robbery. That's correct. Whether it's of cash or whether it's of drugs. And he emphasizes near the end of the transcript multiple times how it's important to be armed to the teeth because of what they may encounter during the robbery. He's talking about the need to get M14s, wear bulletproof vests, and the like. And I think we can relate that to the delusions he seems to be having during that meeting. When I read the transcript, the rest of the people there are planning this robbery. Mr. Patterson is planning for a stash house filled with untold amounts of cash with a mystery gunman in the back. That's where you see the consequences of Judge Mannion's question because if he is this delusional to the point where he can't form the mens rea to commit a crime, we've got issue. That not guilty by reason of mental disease or defect is a different question than the competency question. So it's a challenge for the court system because we have to know where to draw that line as to where the delusion ends up absolving him of criminal liability. And I think that that's entirely possible for another record to explore. We just don't have that record in front of us. But I think the very least we can do in this case is say the district court was under the duty, following this court's opinion, to make an assessment of Mr. Patterson's mental health at the time of that meeting in relationship to the drug quantity in this case. And for these reasons, we would ask that this court vacate the sentence and remand for consideration of that factor explicitly. Thank you, Ms. Varner. We'll next hear from Mr. Reach. May it please the court. Brian Reitz from the United States. I think I would start by saying the issue presented to the court here is maybe much narrower than the questioning and what Mr. Patterson has addressed. The only question is whether the district court clearly erred in finding 20 kilograms as the object of the conspiracy. And as the district court judge said, she would be hard-pressed to find any evidence of any other number because the object of the conspiracy consistently referenced that 20-kilogram number. Sort of turning to what Judge Scudder, you asked about, if we look at the numbers mentioned at that meeting. So there was a prior, of course, fictitious robbery that netted delivery that netted 6 kilograms, one that netted 10 kilograms. But the agent later said that in each of those instances, there was also at least 10 kilograms on the table already at the stash house. So if you add that 10 kilogram to 6 or 10, you're above the 15 kilogram necessary for the guideline number that Mr. Patterson received. So the reason the district court was hard-pressed to find any number because any way you do it, unless you expurgate that statement, it's above 15 kilograms. Let me ask you, in light of what you're saying, let me ask you just to react to something. And that is, the way that I read the transcript of that meeting, or one way to read it that doesn't seem unreasonable, is that the undercover was representing that, look, I've done three deals in there. I did one for 6 and I did two others for 10. And in the final one, when I bought 10, there were 10 more on the table. That's how we get 20. But obviously, when you buy 10 and there's only 10 left, when you walk away with 10, if there were 20 to start. So the concern that I have is that all this is occurring in the same meeting. It's in the same discussion at that Quality Inn in Bloomington, right? Yes, Your Honor. As you pointed out, that is the only, that's the whole world of evidence. That's it. Patterson's not involved in anything else. And so why isn't the fairest inference from this that they were clearly contemplating a multi-kilo robbery, but there's no way to be any more certain as to how many, okay? You just can't with reliability. Six is in there, 10 is in there, 20 is in there. And under the principle that Ms. Varner was advocating, why shouldn't we default, especially given the concerns that the court has expressed about these types of prosecutions, to the lesser amount? In other words, six or 10. To start with, I think all these cases operate under the understanding that it's not an exact science. So we are looking to the best number we can. I think that is, in some ways, I think the court's remand was an opportunity for the district court to look at this anew. And the district court did, and didn't think it was possible, the district court didn't believe it was possible to default to a number that just you couldn't get to without the plus 10. And the evidence also shows that because the conspirators themselves discussed the 20 kilograms. So that number is mentioned. The conspirators, I mean the actual guilty conspirators, not the undercover agent, spun off the agents and understood his statement to mean 20 kilograms. So 20 kilograms is the most commonly referenced number. To the extent there maybe are competing understandings of that, we're under clear error. And I don't think that the district court committed clear error by taking one of two numbers that was, at worst, equally possible. And I don't think they were equally possible. I think the 20 was the more likely number that they were discussing because it was the more consistently referenced as the district court found. So I don't think we can quite say this is equal poisoning. I think you're right. Just in terms of account, it was referenced more than the other two quantities. But I think the reason for that was because of the recency of the transaction. It was the more recent of the three transactions that were talked about. But it, too, was a month ago. In other words, the meeting was November 15th, and I think by the terms of the transcript, the guy, I don't know who said it, the undercover, I guess, that that deal for 10 was a month ago, the last time I was there. So my only point is the reason they're talking about 20 is that's the most recent deal. Yes, I think that's right. But what I would say is even if you take the first deal when the undercover agent said 6 kilograms, that doesn't account for the drugs that he already said were there. So even if the court took the lower number, we would still clear the 15-kilogram threshold. And I think it's really difficult even defaulting to the lowest number. You would have to default to the lowest number discussed and then excise the undercover agent's statement that there were also drugs at the house that he didn't deliver. And I don't see how a district court can clearly err by not doing those two things. I don't think there's any obligation to, one, take the lowest number and then ignore evidence because it's most helpful to a defendant. This sting was apparently focused on some group around Bloomington. Yes, Your Honor. That was committing crimes. Yes, Your Honor. I think this somewhat has colored this argument, especially the prior argument that the court has a reluctance for these stash house robberies. And as I pointed out, our district, at least, does not take these cases anymore. However, this is by, if not an order of magnitude, by some order different because this was to bust up an existing violent robbery crew that was terrorizing both Indiana University students and then other drug dealers in the town of Bloomington, which Bloomington is a small college town and doesn't have much violence. So this was a serious issue in Bloomington, Indiana. The target of it was really Dennis English. The agents didn't target Mr. Patterson. He just happened to be there because Mr. English invited him there. He was known to the person that was committing the robberies, whether he was involved in other ones. It's unclear, but at least the ringleader of the robbery sought out Mr. Patterson for this. So while we understand the court's skepticism of these cases, we think this one is a little different because it did bust up an existing violent robbery crew. And as pointed out, after these arrests occurred, the robberies in Bloomington stopped. Well, I got the impression in the remand that Judge Barker had a lot of familiarity with the whole picture. And that's why she kind of focused into that 20 case. So, I mean, it's almost like saying, well, did Patterson just get dragged in because he was in the wrong place at the wrong time, or was he also a part of this gang of people? Maybe not intricately. Maybe they didn't count on him as much, but at the same time it does seem that she was satisfied with the fact that this was what everyone would call these sting operations, where everything is hypothetical, but they were the type of people who thought this was a good deal. And yes, Patterson was, I don't want to use any term that's not right, but he was kind of messed up, but pretty enthusiastic, that's all. Yes, from a high level of generality, Judge Barker definitely agreed and understood that this was the robbery crew. As to Mr. Patterson's involvement, I think it's somewhat unclear if he'd previously committed robberies with the crew or not. I don't think we know that necessarily. But what we do know is the leader of the robbery crew sought him out to commit this one. And what we also know is that Mr. Patterson enthusiastically agreed, as Judge Scudder pointed out. And beyond that, he armed himself with a stolen firearm as a felon. So I think the argument that he was so delusional that he couldn't agree, that maybe would have some weight if you just took his comments at the quality end. But then he left the quality end and went out and armed himself as a felon who has, of course, serious mental health deficiencies.  And he armed himself. I think that really undercuts the argument that he didn't understand or wasn't able to understand, which I would then step back also and point out that the government recognizes Mr. Patterson's mental health issues, but he was convicted of the conspiracy. He's not challenging that. So it's difficult to conceive how a person has the mental faculties to agree to commit a crime but then not agree to a specific drug weight. I think there is some inherent logical difficulty in that argument. Mr. Reitz, I have one just real brief question. Can you respond to your adversary's point that there's no way on this record to know that any error would be harmless? And the reason is simply that Judge Barker, and perhaps appropriately so, came down 12 months primarily because of Mr. Patterson's success at rehabilitation efforts in prison, not because she said I would sentence him the same way regardless of how I come out on this quantity question. So I would start by saying I think it's fair to say this is maybe not the clearest or strongest harmless error. But I think if we look at her statement in whole, Judge Barker said that her decision on the drug weight had no legal effect because she got to her sentence one way around the bin and she would go the other way around the bin. I think that is very close, if not clear, to saying that she would have sentenced Mr. Patterson the same way either way. Now, we do take the point that the fact she went down maybe is some indication that she would have gone down more. But when a judge says there's no legal effect to this decision, we think it has to mean something, and the only thing it can mean here is that the sentence would have been the same regardless. And I'm sorry that I went over my time. Just a quick fact question. Do you know if Judge Barker presided over the related cases to this case? I believe so, but I'm not 100% certain about that. But I do believe so, Your Honor. Do you happen to know what Mr. English received in terms of his sentence? He received 180, I think, and then Mr. Owings received 240 because he had a prior conviction that was more serious and he was convicted of one thing that the other conspirators weren't. So Mr. Patterson did receive lower than those two. There might have been another defendant that received lower, but he received less than those two. Thank you. Thank you, Your Honor. Ms. Varner, you did not reserve rebuttal. Did you want to make any brief comments? One minute or so. Thank you. Thank you. I just wanted to point out that Mr. Wright's point that if he was competent to commit the crime, then he must have been competent to agree to a drug amount. As an advocate for Mr. Patterson, I'm not entirely certain of his sanity at the time of the offense, but that's not something that we can challenge in this proceeding. And the second point I would make is that the error that we're alleging is not simply Judge Barker's choice between 6, 10, or 20. The error that we're alleging is that following a very troubling transcript, very serious mental health problems, and this Court's admonition and uncertainty about his mental health that Judge Barker did not address at all in making her individualized inquiry his mental health and how that related, if it did, to her finding on the drug quantity. We ask for you to remand for resentencing. Thank you. Thank you, Ms. Varner. The case will be taken under advisement.